Craig Anthony Gelber
Post Office Box 1786
Willits, California 95490
(707) 354-1277
Cgelber707@gmail.com

*Pro se Plaintiff*

FILED (5)

FEB 15 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

KAW

Craig Anthony Gelber,

                Plaintiff,

vs.

City of Willits, City of Willits Water
Department, Brian Bender in both his
official capacity acting as City Manager of
City of Willits and in his private capacity,
Madge Strong in both her official capacity
acting as Mayor of City of Willits and in her
private capacity, Davey Bowles in both his
public capacity as Building Inspector/Code
Enforcement Officer and in his private
capacity, and Kim Smith in both her public
capacity as Utility Billing Clerk and in her
private capacity, and Does 1 through 25,

                Defendants.

Case No.: CV23-0681

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff Craig Anthony Gelber, for his Complaint against Defendant City of Willits, California, et al, alleges as follows:

## NATURE OF THE CASE

1. The case comes from the time that Plaintiff, while in the midst of pursuing an adverse possession claim, had his water utility service disconnected by Defendant City of Willits without his consent or permission, after an account had been established.

2. Plaintiff protested the water shutoff and attempted to appeal the City's actions

numerous times, but was not allowed to redress his grievances in violation of Plaintiffs federal constitutional rights, the California Constitution, and The City of Willits Municipal Ordinances.

3.     Unfortunately, the City Manager, Defendant Brian Bender and the Mayor, Defendant Madge Strong, have no regard for the law or the scope of their power and authority.  Despite holding critical positions of public trust, those same city officials routinely abuse their power and ignore their oath of office.  By way of example, at the time Plaintiff's water was disconnected, he was not in arrears on paying his utility bill, and the shutoff took place during Governor Gavin Newsom's water shutoff moratorium.  When Plaintiff was at City Hall to point that fact out, the response he received was, "We don't care."

4.     Put simply, the City of Willits, acting through its agents Mayor Strong and City Manager Bender, disconnected Plaintiff's water in retaliation for his pursuing an adverse possession claim.  Through this lawsuit, Plaintiff sees to shine a brighter light on this abuse of the public trust and to be made whole for the injuries he suffered as a result of the City's unlawful conduct by unlawfully being deprived of water service for 408 days, for official misconduct by city officials while under the pretense of the color of law, for breach of fiduciary duty, for invasion of privacy, and for violations of his Constitutional and civil rights.

## PARTIES

5.     Plaintiff Craig Anthony Gelber ("Plaintiff Gelber") is a man, living on the soil of Willits in the State of California; located in Mendocino County.  Mr. Gelber is a resident of the State of California.

6.     Defendant City of Willits ("Defendant City") is a municipal Corporation, organized pursuant to Article XI of the California Constitution, and provides the usual variety of services to its residents and visitors as do other municipalities, including police, water,  and fire service.

7.     Defendant City of Willits Water Department ("Defendant Water Dept.") is a municipal utility that sells water utilities to customers who reside within the service area of the City of Willits.  The water department is organized and ran by Defendant City of Willits.  Any reference

made to Defendant City of Willits Water Department shall therefore be deemed to be the same as Defendant City of Willits. Defendant City of Willits Water Department falls within the definition of a "public utility" as defined in the *Public Utilities Code § 216(a)(1)*[1].

8.      Defendant Brian Bender ("Bender") is sued in both his official capacity of City Manager acting for Defendant City of Willits and in his private capacity.

9.      Defendant Madge Strong ("Strong") is sued in both her official capacity of Mayor acting for Defendant City of Willits. Defendant Madge Strong ("Strong") is sued in her private capacity as well as her official capacity.

10.      Defendant Bowles ("Bowles") is an employee of the Defendant City of Willits, acting as Building Inspector/Code Enforcement Officer. Defendants Bender and Strong are therefore vicariously responsible for the acts and omissions of Davey Bowles as they are responsible in some way or another for his hiring, employment, training, and representation of Defendant City of Willits while in the performance of his job duties. Defendant City of Willits is also responsible for the acts and omissions of Defendant Bowles while in the performance of his job essentials. Pursuant to *Gov't Code § 820.8*, Defendant Bowles, in his private capacity, does not have immunity from his own negligent, wrongful act, or omission and is therefore properly sued under the category of negligence and for his wrongful acts.

11.      Defendant Kim Smith ("Smith") is an employee of Defendant City of Willits Water Department, acting as Utility Billing Clerk. Defendants Bender and Strong are vicariously responsible for the acts and omissions of Defendant Smith, as they are responsible for her hiring, employment, training, and representation of Defendant City Water Department while in the performance of her job duties. Defendant City of Willits is also responsible for the acts and omissions of Defendant Smith while in the performance of her job essentials. Pursuant to *Gov't Code § 820.8*, Defendant Smith, privately does not have immunity from her own negligent, wrongful act, or omission and is therefore properly sued under the category of negligence and for her wrongful acts and the injuries they caused Plaintiff.

[1] "'Public utility' includes every common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, sewer system corporation, and heat corporation, where the service is performed for, or the commodity is delivered to, the public or any portion thereof."

-3-

12.     The true names and capacities, whether individual, corporate, partnership, associate, employee, or otherwise, of Defendants sued herein as Does 1 through 25, inclusive, are currently unknown to Plaintiff Gelber, who therefore sues said Defendants by such fictitious names.  Plaintiff Gelber is informed and believes, and based thereon alleges, that each of the Defendants designated herein as a Doe is legally responsible in some manner for the events and happenings referred to herein, and caused injury and damage proximately to Plaintiff Gelber as hereinafter alleged.  Plaintiff will seek leave of court to amend this complaint to show the true names and capacities of the Defendants designated herein as Does 1 through 25 when the same have been ascertained.

13.     Except as hereinafter specifically described, Defendants, and each of them, are and were the agents and/or employees of the other Defendants, and in acting as described herein were acting within the scope of their authority, agency, service, representation and/or employment as agents and/or employees thereof, and with the permission and consent of the other Defendants.

14.     Whenever in this complaint, reference is made to "Defendants," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

### JURISDICTION

15.     This court has subject matter jurisdiction  pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States.

16.     The Court has personal jurisdiction over the City because it is a California municipal corporation organized under a charter adopted pursuant to the Constitution of the State of California.

### VENUE

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the all Defendants in this action reside in this District, all Defendants are residents of the State of California, which is within this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

### DIVISIONAL ASSIGNMENT

/ / / / /

18.    Pursuant to Local Rules 3-2(c) and 3-2(d), this case may be assigned to either the Oakland or San Francisco Divisions of this Court, because a substantial part of the events or omissions giving rise to Plaintiff Gelber's claims occurred in Mendocino County, California.

## CLAIM PRESENTATION

19.    Pursuant to Cal. Gov't Code §§ 905, 910, and 915, Plaintiff Gelber presented his claim for damages to the city of Willits on June 22, 2022.  His claim included all required elements under § 910, including Plaintiff Gelber's name and post office address, the post office address for notices related to the claim, the date, place, and other circumstances of the occurrences that give rise to his claim, a general description of the City's indebtedness and the plaintiff's injuries, the names of the City employees who caused the Plaintiff's injuries, and the fact that the Plaintiff's injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State of California.

20.    The City of Willits rejected Plaintiff Gelber's claim by letter dated August 1, 2022 and effective August 16, 2022  (*See Exhibit A*).  This civil suit for damages is therefore authorized under The Government Claims Act, Cal. *Gov't Code* § 945.4.

## LEGAL FOUNDATIONS

**I.    Adverse Possession.**

21.    Overall, the idea of adverse possession is important because it ensures that the land is used efficiently. If a legal owner is not making use of the property and it is becoming deserted, someone willing should have the ability to take over the land and utilize it efficiently.  The classic justification for this principle is that land should not go to waste. In other words, if the person who is claiming to have adversely possessed the land of another is putting this land to use for a long period of time, and the true owner of the land was not otherwise utilizing the property, the person actually putting the property to use should become the owner.

22.    A landowner has the basic power to exclude. He or she has the legal power to decide who may enter his or her land. If some individual enters that land without such permission, that individual is deemed a trespasser. Because trespass is a tort, the owner can petition a court for an

injunction ordering the intruder's removal. If the trespasser meets the requirements of adverse possession, however, that trespasser cannot be removed. To establish such an adverse possession claim, the trespasser must show that she: (1) actually possessed the land, (2) in an open and notorious manner, (3) exclusively, (4) adversely to the owner's interests, and (5) continuously for a number of years the statute details.  In California, the time period is five years. Adverse possession's essence: adverse possession is an exception to trespass.

23.    Adverse possession not only prevents a trespasser from being removed, it actually transfers ownership of the intruded land to him or her. If the requirements detailed above are met, the trespasser becomes the land's owner at the expense of its real, or title, owner. Indeed, he or she might proceed herself to bring a trespass claim against the owner if the owner ever attempts to reenter the land. This remarkable result of a successful adverse possession claim defies easy explanation.

24.    The adverse possessor has been on the land for a lengthy period of time; that land has become part of his or her life.  For him or her, the property is now a personhood property. The original owner, on the other hand, has not been on the land. Worse still, she has been ignoring it— she was not even aware someone else was using it. Hence the law, via adverse possession, prioritizes the interests of the possessor, who holds the personhood interest in the land, over those of the owner, who now holds a mere fungible interest. Personhood theory adherents thereby situate adverse possession's roots explanation within a property theory focused on individual rights.[2]

## II.    AB 685, The Human Right to Water Bill In California.

25.    With the passage of AB 685 in 2012, California became one of the first states in the United States to recognize the human right to water.  California now has a comprehensive law guaranteeing the right to safe, affordable water **without discrimination, [emphasis added]** prioritizing water for personal and domestic use and delineating the responsibilities of public officials at the state level.  AB 685 statutorily recognizes that "every human being has the right to safe, clean,

---

[2] Nadav Shoked, Who Needs Adverse Possession?, 89 Fordham L. Rev. 2639 (2021). Available at: https://ir.lawnet.fordham.edu/flr/vol89/iss6/12

affordable, and accessible water adequate for human consumption, cooking, and sanitary purposes."
AB 685 has, since its inception, been codified as California *Water Code, Section 106.3.*

26.    In 1928, the state constitution was amended to affirm that water should be conserved for the "interest of the people and public welfare."[3]  Two decades later, California water regulations codified that "the use of water for domestic purposes is the highest use of water."[4]

27.    The state policy objectives outlined in AB 685 closely mirror the definition of the human right to water developed by the international community over the last decade. Under the international definition, everyone has the right to sufficient, safe, acceptable, accessible, and affordable water.[5]  Like AB 685, international standards prioritize water for personal and domestic uses, such as drinking, cooking and basic hygiene, over industry and agricultural uses.[6]  International standards also recognize the crucial role of government in ensuring universal access to safe water.[7]  Water services must be accessible to households, health and public institutions, and workplaces.

28.    Non-discrimination is a core principle of human rights and critical to the implementation of AB 685. Agencies must ensure that all Californians, including vulnerable and marginalized individuals, groups, and communities in rural, tribal, and urban areas, enjoy the human right to water. By employing fair and inclusive practices that guard against discrimination and neglect, state agencies can make progress towards this goal.

29.    Ultimately, the courts have jurisdiction to determine whether an agency has adequately considered the human right to water in accordance with AB 685. The duty to consider the human right to water will be triggered at different junctures depending on the nature and scope of an agency's responsibilities.

---

[3] Cal. Const. art. XIV, § 3 (1928) (*super ceded by* Cal. Const. art. X, § 2 (1976); *codified at* Cal. Water Code § 100 (West 2012)).
[4] Cal. Water Code § 106 (codified in 1943) (West 2012).
[5] Comm. on Econ., Soc., & Cultural Rights, Substantive Issues Arising in the Implementation of the International Covenant on Economic, Social and Cultural Rights: General Comment No. 15 (2002): The Right to Water (Arts. 11 and 12 of the International Covenant on Economic, Social and Cultural Rights), ¶ 2, 29th Sess., 2002, U.N. Doc. E/C.12/2002/11 ( Jan. 20, 2003) [hereinafter General Comment No. 15].
[6] *Id.* at ¶ 2.
[7] See Catarina de Albuquerque, On the Right Track: Good practices in realizing the rights to water and sanitation 31 (2012), available at http://www.ohchr.org/Documents/Issues/Water/BookonGoodPractices_en.pdf [hereinafter On the Right Track]; Int'l Council on Human Rights Policy, Local Government and Human Rights: Doing Good Service (2005).

### III.    Public Officials Have A Broad Fiduciary Duty.

30.    Regardless of whether specific rules of government ethics have been adopted, public officials have a broad fiduciary duty to carry out their responsibilities in a manner that is faithful to the public trust that has been reposed in them. The duties of public officials may extend beyond minimal compliance with codified ethics rules. Even if no ethics code has been adopted, or if no code provision is on point, public officials must act in a manner that comports with their common law fiduciary-duty obligations. Government ethics laws, criminal provisions, and other legislative enactments should be interpreted and applied in light of the demanding loyalty obligations that are imposed on public officials as fiduciaries.[9]

31.    Government Ethics refer to the unique set of duties that public officials owe to the public that they serve. These duties arise upon entering the public work force either as an elected representative, an appointed official, or a member of government staff.  Public ethical obligations exist in addition to general ethical obligations and sometimes government ethics may conflict with personal ethical duties.

32.    The relationship between public officials and the public has been described by scholars as fiduciary in nature. (*See e.g.* Rave, 2013; Leib, Ponet & Serota, 2013; Ponet & Lieb, 2011; Natelson, 2004)  So what is a fiduciary? Dictionary.com defines the term *fiduciary* as relating to, " a person to whom property or power is entrusted for the benefit of another." There at least four factors that identify a relationship as a fiduciary one:

1.    The beneficiary has delegated authority to the fiduciary to act on its behalf;
2.    The fiduciary has discretionary powers over the beneficiary's assets or interests;
3.    The fiduciary is in a position superior to that of the beneficiary due to specialized access, knowledge or ability; and
4.    The beneficiary trusts that the fiduciary will act in the beneficiary's best interest. (Ponet & Lieb, 2011.)[8]

---

[8]  https://www.scu.edu/government-ethics/resources/public-officials-as-fiduciaries/
[9]  Vincent R. Johnson, *The Fiduciary Obligations of Public Officials*, 9 St. Mary's J. on Legal Malpractice & Ethics 298 (2019). Available at: https://commons.stmarytx.edu/lmej/vol9/iss2/4

COMPLAINT FOR DAMAGES

33.     Examples of fiduciary relationships include those of the attorney/client, trustee/trust beneficiary, executor/heir, corporate director/shareholder, and principal/agent. You can see why the public official/citizen relationship is similar: The public delegates governing authority to public officials to exercise discretion over the public treasury and to create laws that will impact their lives.   The public official, once elected, appointed, or hired, is in a superior position to that of the individual citizen due to specialized governmental knowledge and the ability to advise, deliberate, and participate in the representative process.  And finally, the public trusts that the public official will act in the public's best interest.

## III.     Plaintiff Comes Before the Court with Clean Hands.

34.     Plaintiff Gelber believes his hands are clean in the details of this case.  Yes, he did reside in a property after it had been red-tagged, but given the circumstances that Defendant City did not have reasonable, factual, valid grounds for placement of the red-tag, he is well within the scope of open-ness and honesty, as opposed to their intentional fraud and corruption.  A brilliant 2014 article by Kayo Manson-Tompkins with Wolfe Law Firm supports Plaintiff's clean hands (*See Exhibit B*).

35.     A landlord is prevented from shutting off a tenant's utility service pursuant to *Civil Code* § 789.3, yet Defendant City was not even the landlord, so it is unreasonable for them to assume the power to disconnect someone's utilities without any ownership rights over the property.

36.     Plaintiff was forthright, and made an attempt to contact Deutsche Bank to make an offer on the property (*See Exhibit C*).  Each member of the Willits City Council received a courtesy copy of this correspondence and were well aware of Plaintiff's efforts.

37.     Plaintiff received a response from PHH Mortgage, dated 03/17/2021, stating they could not locate the property (*See Exhibit D*).  It even more confirmed his justification that the property had slipped through the cracks at the bank.

## FACTUAL BACKGROUND

### I.     The Trap House.

38.    In October 2020, Plaintiff became aware that he would be moving from where he resided, and he needed had to find a new place to live. Plaintiff had a very small nest egg of savings and he made the decision to locate a suitable property and attempt an adverse possession claim. Adverse possession is not illegal in California (See *Code of Civil Procedure* §§ 318, 325, 328).

39.    Plaintiff learned of a prospective property at 283 Sherwood Road, on Willits, California; in Mendocino County. He inspected the property in early October 2020, and determined the structure was empty, abandoned, and the property taxes were unpaid. The subject property is within the service area of Defendant City of Willits ("City") Water Department.

40.    Extensive cleanup was necessary at the property, which had become a flop house in Willits. It even had a nickname, the "Trap House." Vagrant persons were staying there, and basically ruined a once-beautiful home. There was biohazard filth, trash, and thousands of used syringes throughout the property.

41.    As a result of all the used hypodermic needles strewn everywhere, it was unsafe to even bring a dog or a child onto the property. In addition, there were five (5) burned-up vehicles on the property which were filled with garbage and had no tires; there were two (2) abandoned motor homes that did not run, and twenty-eight thousand (28,000) pounds of trash which included plastic bottles filled with urine and buckets of raw feces. All the trash that was hauled to the dumps, and all the vehicle removal by Plaintiff does not include another [estimated] ten thousand (10,000) pounds of trash that were eliminated by burning on-site.

42.    Numerous rodents had taken up residence at the property. The beautiful redwood paneling half ways up the walls had all been pried off and sold for cash by the homeless. There were holes in the walls, broken windowpanes, graffiti everywhere, and the hardwood living room floor had been painted thick with red paint.

43.    It took Plaintiff and other workers that he paid with his own money, over two (2) months to clean up the property. Finally, it was safe enough that he could bring his dogs onto the soil there, and Plaintiff prepared to move in January of 2021.

## II.    Loss of Water.

44.    On December 7, 2020, Plaintiff completed an application with Defendant City to begin water utility service at the property (*See Exhibit E*).

45.    Sometime in January, 2021, Defendant Bowles personally delivered a demand letter from Defendant Smith on behalf of Defendant Water Dept. (*See Exhibit F*) to Plaintiff Gelber.  The letter accused Plaintiff Gelber of misrepresentation on his water service application because he had checked the box for "I own this home."

46.    Per *Exhibit E,* there are three (3) boxes at the beginning of the application to choose from: "I own this home," "I rent this home," or "I am an agent for the owner."  Plaintiff wasn't renting, he was not an agent for the owner, there was no fourth box marked "Other" for him to choose from, so he picked the one marked, "I own this home."

47.    Defendant Bowles was angry the day he hand-delivered the letter to Plaintiff.  He yelled at him as he first approached, "You lied on your application!"

48.    Plaintiff stated he had not lied—that he was in the subject property doing an adverse possession claim, to which Bowles responded, "I'm going to do everything in my power to see that doesn't happen."

49.    The letter informed Plaintiff that he had approximately two weeks to provide either a bank statement, deed, or title policy to prove he owned the home.  Otherwise, his water service would be disconnected on February 1, 2021.

50.    The letter stated, "per our City policy we are required to have verification that a person has the right to reside in and receive utility service" at the address where they want water service.

51.    Willits Municipal Code Ordinance 14.08.170 – Owner, reads as follows:

> " 'Owner' means the person(s) owning an interest in the fee. or the person(s) in whose name the legal title to the property appears. by deed duly recorded in the county recorder's office. **or the person(s) in possession of the property or buildings under claim of, or exercising acts of ownership over same for himself.** or as executor. administrator. guardian or trustee of the owner(s)." **[emphasis added.]**

52.    One can therefore extrapolate the following: " 'Owner' means…the person(s) in possession of the property or buildings under claim of, or exercising acts of ownership over same for himself." Therefore, a person pursuing an adverse possession claim tailors well within Defendant City's governing definition of "Owner".

### III.    Plaintiff Attempts to Redress

53.    Plaintiff responded to *Exhibit F* with his correspondence, dated January 25, 2021, claiming adverse possession (*see Exhibit H*), and that should his reply be insufficient, he was requesting a special circumstance, pursuant to Willits Municipal Ordinance 14.04.060-Relief on application.[9]

54.    No one from Defendant City replied to the correspondence in *Exhibit H,* and proceeded to disconnect his water service without another word to Plaintiff prior to the shutoff.

55.    Plaintiff next gave another request to appeal to Defendant City on or about February 10, 2021 (*See Exhibit I*); this was the day after Defendant City had posted a red-tag on the premises, declaring it uninhabitable. The day prior, February 8, 2021, Defendant City had physically removed the water meter from the property.

56.    On February 18, 2021, Plaintiff received a letter from Defendant Bowles as agent for the principal, Defendant City, informing him that since he had not supplied the City with the documents they had demanded, they were under no obligation to communicate with him further (*See Exhibit J*).

57.    Plaintiff wrote another letter to Defendants and the City Council Members on March 31, 2021 (*see Exhibit K*) to again request an appeal. Plaintiff politely expressed, in great detail, his valid grievances for the water disconnection, the unfairness of it, and asked some questions regarding the situation. His correspondence was never answered by anyone.

---

[9] 14.04.060 — Relief on application. A. When any person, by reason of special circumstances, is of the opinion that any provision of this title is unjust or inequitable as applied to his premises, he may make written application to the city council, stating the special circumstances, citing the provision appears, by deed duly recorded in the county recorder's office or the person(s) in possession of the property or complained of, and requesting suspension or modification of that provision as applied to his premises. B. If such application be approved, the city council may, by resolution, suspend or modify the provision complained of, as applied to such premises, to be effective as of the date of the application and continuing during the period of the special circumstance.

58.     After suffering for months without water service, Plaintiff attended a city council meeting via Zoom, on June 9, 2021. (*See Exhibit K, Pg. 3, ¶7.*) When it was his chance to have three (3) minutes to speak, he brought up his situation and stated that he desired to have the council hear his grievance and request the vote of a special circumstance.

59.     Plaintiff was informed at that public meeting that he needed to speak with Defendant Bender and have the subject placed on a future meeting agenda. Sometime in June 2021, Plaintiff and a witness went to City Hall to ask Defendant Bender for placement on a future council meeting agenda. Plaintiff was denied that opportunity by Defendant Bender.

60.     "No. It's not going to happen." Bender said. "Why not?" asked Plaintiff. "Just no." said Defendant Bender. He offered no additional conversation, explanation, or reason. His speaking manner clearly indicated the subject was closed for good.

**IV.     The City's Dishonesty.**

**A.     Where's That Policy?**

61.     Plaintiff submitted a Public Records Act (*See Exhibit L*) request to Defendant City to procure a copy of the policy they had referenced in *Exhibit F*, (¶1, line 6) ("Per our City policy we are required to obtain permission for anyone not owning a property to have a written agreement from the owner or property manager to obtain utilities"). He wanted to see the actual policy they had based their water disconnection on and had asked in his request, "if none exists, please so state."

62.     *Exhibit L* also shows the response that Defendant City provided to Plaintiff, which was not evidence of a singular policy as they claimed they were adhering to when they disconnected his water. What Plaintiff did receive was a vague, mishmash conglomeration of four different ordinances that he is supposed to combine and construe, in his own imagination, that such a nontangible policy existed, and Defendants had not prevaricated when they told him they were adhering to that policy.

63.     It appears there is no policy as the Defendants stated to Plaintiff in their original letter, yet Defendant City still would not furnish Plaintiff with a simple statement that, "No such policy

exists." Plaintiff wrote another correspondence and addressed the incompleteness of the information Defendant City has provided to him (*See Exhibit M*).

64.    In response to *Exhibit M*, Plaintiff received a copy of the same response he had received prior in *Exhibit L*.

**B.    A Red-Tag on the Property?**

65.    On or about February 9, 2021, Defendant Bowles posted a red-tag Notice of Nuisance at the property (*See Exhibit N*). This was **after** Plaintiff had the subject property cleaned up for an entire month. Coincidentally, this was also the day **after** Defendant City had physically removed the water meter from the property.

66.    The violations cited in the notice did not exist, except for one: a *Health & Safety Code*, section 17920.3(5)—lack of hot and cold running water to plumbing fixtures in a dwelling unit— which that violation was caused by Defendant City shutting off the water.

67.    Plaintiff's *Exhibit O* are results of a Public Records Act request that was placed with Defendant City whereby he asked for copies of all correspondence pertaining to the Notice of Nuisance posted at the property, and the subsequent follow-up by Defendant City. This exhibit includes a cover sheet which describes each document the Defendant City provided.

68.    Defendant City knowingly and willfully charged Deutsche Bank National Trust Co. and/or Altisource property management for fines and violations and liens on the property without just cause, and based on false violations. The violations existed, apparently as of August 2020, prior to Plaintiff moving onto the property. All the violations were abated by Plaintiff during the months of October 2020 to January 2021, as evidenced by Plaintiff's work log at the property, and the descriptions of work performed (*See Exhibit P*).

69.    In assessing the Hours log and description of the work done, it is clear that all the cleanup of the property was complete after one thousand two hundred sixty-four (1,264) hours had been put into the property as of January 31, 2021. Please note that *Exhibit P* demonstrates that in February 2021, the workload had shifted to repairing damage to the inside of the property. All the

outside nuisance and blithe were gone.

70.    Plaintiff has witness after witness after witness who will testify that he did an extensive cleanup of the property and that the nuisance violations which constituted the basis for the property being red-tagged on February 9, 2021 had been remedied and did not exist when the red-tag was placed. Plaintiff will provide photo evidence at trial of the condition of the property at the time the red-tag was placed on the premises. There was no valid justification for red-tagging the property or filing liens, or charging invoices for violations.

71.    On January 22, 2021, the property management company, Altisource, sent Defendant Bowles an email acknowledging the Notice of Violation (*See Exhibit O-(1)* [re: Notice of Violation]) on 08/27/2020 (*See Exhibit O-(10)*).

72.    On January 22, 2021 Defendant Bowles responded to the acknowledgment email with his email (*See Exhibit O-(11)*) that did not address the matter at hand, being the Notice of Violation, but instead, Defendant Bowles proceeded to forward Plaintiff's *Exhibit G* to Altisource. This communication was confidential from Plaintiff to Defendant City, and Defendants had no permission from Plaintiff to forward his communication to anyone.

73.    On February 1, 2021, Altisource again contacted Defendant Bowles (*See Exhibit O-(12)*) stating they had made attempts to call him by phone but were unsuccessful. They further stated that if they did not hear back from him within the next five (5) business days, they would consider the matter closed.

74.    That same day, Defendant Bowles replied to Chandan Day with Altisource to again, forward Plaintiff's private and confidential communication to Defendant City without his express consent or permission (*See Exhibit O-(13)*).

75.    The next communication we see regarding the Notice of Nuisance posted on February 9, 2021 is on October 24, 2021 (*See Exhibit O-(14)*), when the property management company, Altisource, contacted Defendant Bowles by e-mail and to request a copy of the notice of violation and the corrective actions required. They also mentioned they had notification of open liens on the

COMPLAINT FOR DAMAGES

property, which means that during the timeframe from Defendant City placing the unwarranted Notice of Nuisance at the property until at least October 24, 2021, Defendant City had gone so far as to file liens on a property they had fraudulently declared a nuisance.

76. Defendant Bowles, responded to that request by saying he would scan and send a copy of the notice of nuisance along with current invoices for the violations (*See Exhibit O-(14)*)

77. It is shocking and unfathomable that Defendant City just went ahead and proceeded with its acquiring of that property as though Plaintiff had never been there and had never abated the nuisance. It's almost as if Plaintiff interfered with a pre-planned scheme for Defendant City to acquire that property at an extremely low price, and which would benefit the city's asset portfolio by a huge profit margin. This is not unlike crimes that the federal RICO Act was designed to encompass.

78. The next communication we see between Defendant City, through its employee, Defendant Bowles and Altisource regarding 283 Sherwood Road, is on March 29, 2022 (which is exactly two weeks after Plaintiff vacated the property) (*See Exhibit O-(16)*). This email is an exact duplicate of the message sent to Defendant City in *Exhibit O-(14).*

79. Finally, we get to April 18, 2022 when Altisource emails Davey Bowles to inform him that they had sent a contractor to the property who verified that the property was secured (*See Exhibit O-(17)*).

80. The final correspondence Plaintiff attained via his Public Records Act Request for follow-up documentation in regards to the Notice of Nuisance at 283 Sherwood Road is on May 2, 2022 (*See Exhibit O-(18)*). An email from Davey Bowles to Altisource informed them that although their contractor found the property secure, that the City of Willits required Altisource to schedule an inspection, and that fines would continue to accrue daily.

81. Again, there was no public nuisance that existed at the time the Defendant Bowles claimed it did. This is blatant corruption and fraud.

**C.      Discrimination.**

82. Plaintiff went door-to-door in his neighborhood and asked residents of Willits if they

had to provide Defendant City a title policy, mortgage, bank statement, or deed in order to have their water service. None of them did. (*See Exhibit Q*).

74.    In an email between Jim Lance, City Attorney, and Defendant Bowles dated 01/26/2021, (*see Exhibit R, line 3*), Bowles communicates that he, "dislike[s] the idea of seemingly assisting him [Gelber] with adverse possession by providing services and billing statements to that address."

75.    This was a simple matter, not for Defendant Bowles to like or dislike. It's a matter of Plaintiff having the right to life, liberty, and the pursuit of happiness. However, Defendant Bowles took it personally, for some reason, to discriminate against Plaintiff, and do whatever he could to interfere with his adverse possession claim.

76.    As evidenced by news articles about Deutsche Bank (*see Exhibit R*), foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property, but the values of nearby homes as well. Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.[10]

77.    It's not good enough that all the neighbors were very grateful to have Plaintiff be there, and have the property cleaned up, as described herein above, and no longer did the subject property bring down the values of the surrounding properties, and that Plaintiff's work benefited Defendant City by eliminating the public nuisance.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983)

## RIGHT TO REDRESS A GRIEVANCE

**(Against Defendants Bender and Strong, in their private capacities, and Defendant Does 1 to 25)**

[10] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Summit, Atlanta, Georgia at pg. 4 (November 15, 2012) available at www.federalreserve.gov/newsevents/speech/bernanake20121115a.htm.

78.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

79.    The Eleventh Amendment does not bar claims for damages against state officials in their personal capacities.

80.    Plaintiff Gelber claims that Defendants Bender and Strong and Defendant Does 1 to 25, in their personal capacities violated his civil and Constitutional rights while acting under the color of law. What is meant, in this particular claim, by color of law, is that the individuals, in the acts or omissions they are responsible for, exercised power that they would not have had, were it not for the authority of their official positions.

81.    The First Amendment of the United States Constitution, which reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  Defendants Bender and Strong in their personal capacities and Defendant Does 1 to 25 intentionally and recklessly violated Plaintiff Gelber's rights for redress of grievances under this amendment.

82.    While intentionally violating Plaintiff Gelber's rights under the First Amendment of the United States Constitution, Defendants Bender and Strong in their private capacities, and Defendant Does 1 to 25, simultaneously violated Plaintiff Gelber's rights under Article I, Section 3(a) of the California Constitution, which reads, "The people have the right t o instruct their representatives. petition government for redress of grievances, and assemble freely to consult for the common good."

83.    As described herein above, Plaintiff Gelber made numerous attempts to appeal the disconnection of his water service: (1) In *Exhibit 7*, Plaintiff's first response letter to Defendant City's demand for personal financial information; (2)  In *Exhibit 8*, another letter to Defendant City, requesting a review; (3) In *Exhibit 10*, another letter to Defendant City pursuant to Willits Municipal Ordinance 14.04.060—Relief on application; (4) In *Exhibit 11*, by attending a city council meeting via Zoom, on June 9, 2021; (5)  By approaching Defendant Bender with a witness some time in June

2021, when he asked to place his request before the city council by putting in on an upcoming agenda.

84.    All efforts and attempts by Plaintiff were denied or ignored. Defendants Bender and Strong and Defendants Does 1 through 25 were acting under the pretense of the color of law when they caused the injuries to Plaintiff because they were performing actions under which the state owes constitutional obligations to Plaintiff Gelber. In this case, the individual officers' conduct conformed to public policy custom, or practice.

85.    Plaintiff had a legitimate grievance to discuss and had the right to appeal or ask for a special circumstance pursuant to Willits Municipal Ordinance 14.04.060. As these attempts by Plaintiff for an appeal took place, Defendants Bender and Strong, and Defendant Does 1 to 25, knew, or should have known, that he had the right to go through the appeal process, the same as any other public citizen, and that he was illegally being deprived of those rights.

86.    The conduct of the Defendants, and each of them, violated Plaintiff Gelber's rights as described herein above whereby he suffered damages and injuries in at least the following ways:

(i)    Daily suffering for 408 days from 02/01/2021 until 03/15/2022 by having to live without water utilities.

(ii)    The inconvenience of having to travel and bother friends and acquaintances in order to fill 5-gallon jugs with water and load and unload them back at the property, and also having to travel back and forth to bother friends and acquaintances in order to shower someplace other than where he resided.

(iii)    Emotional stress and anxiety, including humiliation, shame, frustration, anger, confusion, insult, mortification, depression, which only got worse as time progressed.

(iv)    Nominal damages pursuant to Plaintiff's Notice of Intent-Fee Schedule, which he caused to be delivered by Registered Mail to Defendant City on or about October 5, 2021 (*See Exhibit 20*), in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983)

### RIGHT TO PURSUE AND OBTAIN HAPPINESS

**(Against Defendants Bender and Strong, in their private capacities, and Defendant Does 1 to 25)**

87.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

88.    The Eleventh Amendment does not bar claims for damages against state officials in their personal capacities.

89.    Plaintiff Gelber claims that Defendants Bender and Strong and Defendant Does 1 to 25, in their personal capacities, violated his civil and Constitutional rights while acting under the color of law. The individuals, in the acts or omissions they are responsible for, exercised power that they would not have had, were it not for the authority of their official positions.

90.    The Declaration of Independence, in part, reads, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed."

91.    The Fourteenth Amendment, Section 1, of the United States Constitution says, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

92.    Article I, Section 1 of the California Constitution reads, "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

93.    As described herein above, Plaintiff was pursuing happiness via his adverse possession attempt to eventually gain title to the property at 283 Sherwood Road, on the soil of Willits, in the State of California; county of Mendocino, after grueling labor and financial investment.

94.    In order to fully achieve happiness by residing in a dwelling, it is necessary to have utilities at the same. By depriving Plaintiff of water utilities and forcing him to have to survive without an important necessity of life, Defendants willfully intervened with Plaintiff's right to his pursuit of happiness.

95.    The Supreme Court has held that, "MLG&W and other public utilities in [ ] are obligated to provide service "to all of the inhabitants of the city of its location alike, without discrimination, and without denial, except for good and sufficient cause," *Farmer v. Nashville*, 127 Tenn. 509, 515, 156 S.W. 189, 190 (1913), and may not terminate service except "for nonpayment of a just service bill," *Trigg*, 533 S.W.2d at 733. Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

96.    Again, these private party Defendants acted under color of law when they performed the above-referenced acts or omissions under which the state owed constitutional obligations to Plaintiff Gelber by him being a public citizen.

97.    The conduct of these Defendants violated Plaintiff Gelber's rights as described herein above whereby he suffered damages and injuries in at least the following ways:

(i)    Daily suffering for 408 days from 02/01/2021 until 03/15/2022 by having to live without water utilities.

(ii)    The inconvenience of having to travel and bother friends and acquaintances in order to fill 5-gallon jugs with water and load and unload them back at the property, and also having to travel back and forth to bother friends and acquaintances in order to shower someplace other than where he resided.

(iii)    Emotional stress and anxiety, including humiliation, shame, frustration, anger, confusion, insult, mortification, depression, which only got worse as time progressed.

(iv)    Nominal damages pursuant to Plaintiff's Notice of Intent-Fee Schedule in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### UNRUH CIVIL RIGHTS ACT (CAL. *CIVIL CODE* § 51)

**(Against Defendant City, Defendants Bender and Strong, and Defendant Does 1 to 25))**

98.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

99.    The objective of the Unruh Civil Rights Act is to prohibit businesses from engaging in unreasonable, arbitrary or invidious discrimination. The Unruh Civil Rights Act applies not merely in situations where businesses exclude individuals altogether, but where treatment is unequal. There is no requirement that an aggrieved party must demand equal treatment and be refused.

100.    The Act must be construed liberally in order to carry out its purpose.

101.    By disconnecting his water utility service as described herein above, Defendants presented Plaintiff with an exclusionary practice that amounts to discrimination. "Like a private corporation, it is the duty of the city to furnish without discrimination to all its inhabitants who apply there for a supply of water upon such applicants complying with such reasonable rules and regulations as it may lawfully establish for the conduct of the business." *Nourse v. City of Los Angeles*, 25 Cal.App.4th 965, 143 P. 801 (1914).

102.    "In general, a person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal.5th 1019, 1023, 250 Cal.Rptr.3d 770, 446 P.3d 276 (2019).

103.    Plaintiff was harmed by the acts or omissions of Defendants in at least the following ways: violation of the Unruh Civil Rights Act, *Cal. Civ. Code* §§ 51 et seq. that caused Plaintiff damages.

104.    Plaintiff has suffered and will continue to suffer harm as a result of the Defendants' unlawful and wrongful conduct.

105.    Defendants discriminated in violation of a reasonable regulation, and the

discrimination was not rationally related to the services it performs.

106.    Defendant City, and Defendants Bender and Strong, lack of, and/or failure to enforce adequate policies and procedures for the response to Plaintiff's complaints and to his situation denied Plaintiff full and equal accommodations, advantages, facilities, privileges, or services for 408 days from on or about 02/01/2021 until 03/15/2022, based upon the fact that he was pursuing an adverse possession claim at 283 Sherwood Road.

107.    Defendant City and Defendants Bender and Strong unwittingly overlooked, disregarded, ignored, and took for granted the fact that 57-year old white males, who are pursuing adverse possession can be harmed by having their water utility service disconnected.

108.    The Act's remedial provisions are set forth in Cal. *Civ. Code* § 52(a), which provides: Whoever denies aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.5, is liable for each and every offense for the actual damages and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than four thousand dollars ($4,000), and any attorney's fees that mat be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

109.    Plaintiff need not prove that he suffered actual damages to recover the independent statutory damages of $4,000.  Plaintiff was injured by Defendant City Water Department's violations of Cal. *Civ. Code* § 51, et seq. and bring this action to recover statutory damages.

110.    As a direct and proximate result of Defendant City and Defendants Bender and Strong's acts, omissions, and wrongful conduct, Plaintiff was put at unnecessary risk of harm and has suffered damages in at least the following ways:

(i)    Emotional and mental anguish in the form of shock, emotional distress, physical manifestations of emotional distress, including depression, anxiety, humiliation, loss of enjoyment of life, and a general distrust and dislike of local government officials.

(ii)    Plaintiff has suffered and continues to suffer, and was prevented and will continue to

be prevented from performing daily activities and obtaining the full enjoyment of life.

(iii)    Plaintiff has suffered damages, both general and special damages, in an amount presently unknown, and to be proven at trial.

(iv)    Plaintiff has suffered nominal damages pursuant to his Notice of Intent-Fee Schedule in an amount to be determined at trial.

111.    As a direct, proximate, and legal result of Defendant City and Defendants Bender and Strong's violations of Cal. *Civ. Code* § 51, they are liable to Plaintiff for each and every offense for the actual damages, and any amount that may be determined by a jury, or a Court sitting without a jury, up to a maximum of three times the amount of actual damage, but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the Court in addition thereto, suffered by Plaintiff as he was denied the right provided in Cal. *Civ. Code,* section 51.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF CAL. *WATER CODE* § 106.3

### (Against All Defendants)

112.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

113.    California *Water Code,* section 106.3 reads, in part: "It is hereby declared to be the established policy of the state that every human being has the right to safe, clean, affordable, and accessible water adequate for human consumption, cooking, and sanitary purposes."

114.    The City had no adequate justification for terminating Plaintiff's water utilities. Defendants, including Defendants Does 1 to 25, were mandated to provide Plaintiff with the availability of water utility service, as long as he was responsible and paid his bill. Which he did.

115.    Persons who are performing adverse possession are nonetheless considered human beings and deserve the right to water. Defendants, including Defendants Does 1 to 25, also had a duty to adhere to the governor's emergency executive order, in light of the COVID-19 pandemic. They had a duty to the Plaintiff to conduct themselves with honesty and integrity, and to abide by statutory

law and moral law, international law and human law, and not to deprive an individual from receiving water. They also had a duty to treat all their patrons the same way and not preclude any one individual from using the Water Department services.

116. The indignities that Plaintiff had to endure by living without water utilities are such that they will remain in Plaintiff's memory for the rest of his life as a very negative mental scar. To force Plaintiff to live without water is not unlike constructive eviction on the part of the Defendants; and constructive eviction is illegal. Defendants had no legal right to forcefully disconnect Plaintiff's water lifeline.

117. By disconnecting Plaintiff's water service, Defendants forced him to live in squalid, unsanitary conditions. He had no means to groom himself, or bathe, where he lived. Or brush his teeth. He had no water to drink or cook with, and was forced to spend precious funds to purchase bottled water daily. He was unable to properly clean at the subject property, water the vegetation in the yard, wash his car if he so desired, have water for his dogs to drink, or even wash his hands. He had to expend extra money for gas to drive places where he could fill up 5-gallon jugs of water, and bring them back to the property to use. In case of a fire, there was no water for an emergency. Plaintiff was unable to clean tools and paintbrushes, mop the floors, or flush the toilet. It was a travesty and an extreme hardship.

118. Plaintiff seeks damages pursuant to California Civil Code, section 3333 in the amount that will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not, to be determined by a jury at trial or by the Court presiding over the trial.

119. As described herein above. Defendants violated Plaintiff's human right to water. and they did so under the color of law. By doing so. caused the Plaintiff's damages in at least the following ways:

(i)    Having the struggle to survive without water on a day-to-day basis for 408 days from 02/01/2021 until 03/15/2022.

(ii)    Having the inconvenience and cost of having to go out and purchase bottled water. or

the embarrassment of having to go out to friends and acquaintances and ask them to fill up several 5-gallon jugs of water and have to bring them back to the house for use.

(iii)    Having to spend money on gas to drive to friends and acquaintances houses to take a shower. Every time this happened, (which wasn't often enough, because Plaintiff did not like having to disrupt other people's households) Plaintiff would have to pack up a shower bag, pack up clean clothes, pack up shampoo, pack up towels, etc., and drag them to someone's house. When done with the shower, have to pack up his bag again, and drag everything back to the house and unload it. It was terribly inconvenient and got to be depressing and humiliating, and stressful. And it consumed a lot of time. A person should just have to walk into their own bathroom and have everything there, and simply take a shower, not have it be some prolonged ritual that cost money each time, on top of it. One can imagine that, after having to go through such a ritual, each time that a person needed or wanted to bathe, that after a prolonged period of time [as in 408 days], that it would be mentally exhausting and depressing. And once a person has begun to live with the mental fatigue, as just described, it can manifest itself in other potential health dangers in the body.

(iv)    The indignity of being treated as a second-class citizen, and not being good enough as all the other water customers;

(v)    Nominal damages pursuant to Plaintiff's Notice of Intent-Fee Schedule for a violation of his God-given rights in an amount to be determined at trial;

(vi)    Emotional stress and anxiety, including horror, shame, mortification, anger, humiliation, frustration, sadness, depression, grief, despair, hopelessness, and vexation.

(vii)    By their malicious, oppressive, and fraudulent acts in disconnecting Plaintiff's water utility service, Plaintiff is entitled to punitive and exemplary damages in order to make an example of Defendants and Defendant Does 1 to 25, and to punish them so they are deterred from behaving in the same way towards someone else.

**FIFTH CLAIM FOR RELIEF**

**BREACH OF THE FIDUCIARY DUTY OF CONFIDENTIALITY**

**(Against Defendants City, Bender, Strong, and Defendant Does 1 to 25)**

120.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

121.    Defendants Bender and Strong and Defendant Does 1 through 25 held positions of trust in the performance of their official capacities for the principal, Defendant City of Willits.  These actors have taken official oaths of office in relation to their positions (*See Exhibit 21*).

122.    Defendants Bender and Strong were Plaintiff's fiduciaries while in the performance of their positions; the Defendants as public officials, and Plaintiff Gelber as a public citizen.

123.    Defendant Bowles, while acting as Building Inspector/Code Enforcement Officer, an employee of Defendant City, had certain information relating to Plaintiff Gelber. Namely, that he was residing at 283 Sherwood Road on the soil of Willits and that he was pursing an adverse possession claim there.

124.    Defendants Bender and Strong, while acting in their official capacities for Defendant City, are vicariously responsible for the acts or omissions of the employees they are responsible for overseeing, hiring, training, and employing.

125.    Defendant Bowles, while acting as Building Inspector/Code Enforcement Officer, was an employee of Defendant City, and Defendants Bender and Strong are and at all relevant times herein were, responsible for Defendant Bowles' acts or omissions.

126.    Defendant Bowles knew, or should have known, that the information he had pertaining to the Plaintiff was confidential, and the information was not a matter of general knowledge.

127.    Plaintiff did not at any time, give permission for his correspondence to Defendant Kim Smith, dated January 25, 2021, to be forwarded to or shared with Altisource or anyone else, for that matter.

128.    Plaintiff did not at any time, give permission for Defendant Bowles to inform Altisource or anyone else that he was pursuing an adverse possession claim at 283 Sherwood Road.

/ / / / /

129.    On January 28, 2021, Defendant Bowles forwarded to Altisource a copy of Plaintiff's letter as evidenced by an email he sent to the email address ppiescalations@altisource.com (*see Exhibit O-(11)*). Bowles also typed a note that Plaintiff was "claiming adverse possession" of the property.

130.    On February 1, 2021, Defendant Bowles, employee of Defendant City, again, forwarded to Chandan Day, Senior Analyst, Compliance, for Altisource, a copy of Plaintiff's letter as evidenced by an email he sent to the email address altisource@usaemail.icasework.com (*see Exhibit O-(13)*). Davey Bowles again wrote a message to inform Altisource that the Plaintiff was "claiming adverse possession" of the property.

131.    Plaintiff did not give informed consent to Defendant Bowles or Defendant City or Defendant Does 1 to 25, that they could relay information to anyone about his adverse possession claim, where he resided, or that anyone else could have a copy of his private correspondence to Defendant City.

132.    Defendants Bender and Strong, while acting in their official capacities, are vicariously responsible for overseeing, managing, properly training and supervising employees of Defendant City of Willits and those employees' acts or omissions.

133.    Defendant Bowles should have received proper training in what could be considered as confidential information and that by distributing confidential information without permission, it subjects the city to legal action.

134.    Plaintiff Gelber was harmed by the above-mentioned acts or omissions, and those acts or omissions were a substantial factor in causing Plaintiff's harm; whereby was damaged in at least the following ways:

(i)    His adverse possession claim was now at risk of failure, due to the property management company being made aware of what Plaintiff was doing. If Altisource had not been informed of Plaintiff's claim, and nature had been left to take its course, they may have not even looked at the property again for the remaining years.

(ii)    Plaintiff suffered nominal damages pursuant to his Notice of Intent-Fee Schedule,

which Defendant City is in receipt of, and which did not rebut or rebuke its contents. Plaintiff presented this document to Defendant City by Registered Mail, and the document was received at the address where it was sent. This amount is to be determined at trial.

(iii)  Plaintiff's investment of labor, time and materials spent to clean up and improve the property in the amount of $79,929.57 was put at economic risk.

(iv)  Mental and emotional anguish due to worry, stress, anxiety, fear, depression, and anger over his dream of completing the adverse possession and gaining title to the property failing due to the interference when Defendant City forwarded Plaintiff's confidential information to Altisource.

(v)  Exemplary damages at the hands of Defendants to punish them for their outrageous conduct and to deter them from doing the same acts or omissions to others.

## SIXTH CLAIM FOR RELIEF

### NEGLIGENCE

### (Against All Defendants)

135.  Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

136.  Defendant City, as a local municipality, has a special duty to provide due care to ensure and protect and aid in the protection of its public citizens' rights. Defendants Bender and Strong, in their official capacities, and Defendant Does 1 to 25 also have a special duty to provide reasonable care to ensure and protect all public citizens' constitutional rights, such as the right to redress the government for grievances, the right to be secure in their homes and papers, the right to obtain property and pursue happiness, and the right to privacy, the right to receive water utilities, and the right to have fair and just laws imposed, as well as the right to due process..

137.  This duty includes one to take reasonable steps in order to prevent and deter those public citizens from coming to harm by their knowledge, fairness, and integrity in implementing rules and regulations, and to follow its own municipal ordinances, and to properly respond to complaints and requests for appeals where its own bylaws have codified those procedural remedies.

138.    In other words, to follow the law to the letter.

139.    Defendant City and Does 1 to 25, including its agents and employees, have special duties to protect Plaintiff and treat him the same as any other public citizen, whether he was pursuing adverse possession or not. Defendant City, including its agents and employees, and Defendant Does 1 to 25, and specifically Defendants Bender and Strong, voluntarily accepted the entrusted care of Plaintiff's rights, as evidenced by their oaths of office.

140.    Upon information and belief, Defendant City and Defendant Does 1 to 25, and its agents and employees, knew or should have known of the prevalence in protecting its public citizens' rights and the likelihood of risk and harm by disconnecting Plaintiff's water, especially during the water shutoff moratorium imposed by Governor Gavin Newsom amidst the COVID-19 pandemic, absent implementation and enforcement of appropriate policies.

141.    Defendant City and Defendant Does 1 to 25, including its agents and employees, breached its duty of care to Plaintiff Gelber by failing to implement and enforce uniform policies and procedures for the prevention, deterrence and response to Plaintiff's repeated complaints of having to endure life without water where he lived, and failing to cooperate with Plaintiff's good intentions.

142.    Defendant City, Defendants Bender and Strong, Defendant Does 1 through 25, and Defendant Bowles and Smith's negligence was a substantial factor in causing Plaintiff Gelber's harm.

143.    Pursuant to *Gov't Code* §§ 820 et seq., Defendant Bowles and Defendant Smith owed Plaintiff a duty to treat him with respect and use reasonable care when dealing with Plaintiff, as well as any other public citizen.

144.    Defendants Bowles and Smith failed to act as a reasonable or prudent person would act in the same or like circumstances when Defendant Bowles failed to recognize Plaintiff's rights, breached a duty of confidentiality, failed to communicate with him regarding his water shutoff appeal.

145.    Defendant Smith acted negligently when she wrote the letter to Plaintiff claiming they would shut his water off if he failed to adhere to their city policy, when she had no policy to refer to. This letter is what started the entire issue.

146.    As a result of Defendant City, Defendant Bender, Defendant Strong, Defendants Bowles and Smith, and Does' 1 through 25, above-described conduct in failing to use reasonable care in the manner that a reasonable and prudent person would use under the same or like circumstances, Plaintiff's was harmed in at least the following ways:

(i)    Emotional distress and continuing emotional distress, physical manifestations of emotional distress including anxiety, depression, emotional anguish, fear, anxiety, humiliation, and other physical and emotional injuries.

(ii)    Damages, both economic and non-economic, in the past, present, and future, for which this claim is made.

(iii)    General and special damages in an amount to be proven at trial.

(iv)    Monetary damages pursuant to Plaintiff's Notice of Intent-Fee Schedule in an amount to be determined at trial *(See Exhibit T)*.

(v)    Three times the awarded damages, when proven at trial, for those Defendants who acted willfully and wantonly.

## SEVENTH CLAIM FOR RELIEF

## NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION

### (Against Defendant City, )

147.    Plaintiff reincorporates and realleges all preceding paragraphs as if set forth fully herein.

148.    Pursuant to *Gov't Code* §§ 815.3 and 815.6, in their official capacities as City Mayor and City Manager, Defendants Strong and Bender, respectively, and Defendant Does 1 to 25 are responsible as agents, employees, or officials of the principal, City of Willits, for the acts or omissions of its employees, while acting in the course of their employment.

149.    Further, Defendants Bender and Strong had a mandatory duty as imposed by their oaths of office, to ensure that Plaintiff Gelber's Constitutional rights were not violated. Defendants violated their duties as described herein above and below.

150.    Were it not for the inadequate training policies and procedures offered by Defendant City and Defendant Does 1 to 25,  Plaintiff's constitutional and other statutory rights would not have been violated with the callous indifference in which they were.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91 (1989); *Garmon v. Cnty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016); *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014); *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008).

151.    This failure to properly train its employees, as evidenced by the statement to Plaintiff that "We don't care," when it came to their attention that they were in violation of Governor Newsom's water shutoff moratorium, and Bender's refusal to place Plaintiff's grievance before the city council so that it could be redress is, indeed,  a conscious choice was made to callously deny a public citizen his rights.

152.    The need for more or different training is so obvious, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  *City of Canton*, 489 U.S. at 390*; see Long*, 442 F.3d at 1186–87; *Johnson*, 388 F.3d at 686; *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004); *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001); *Oviatt v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992); *Merritt*, 875 F.2d at 770; see also *Henry v. Cnty. of Shasta*, 137 F.3d 1372, 1372 (9th Cir. 1998) (order) (amending originally filed opinion to include statement that turning blind eye to constitutional violation can demonstrate deliberate indifference).

153.    As also evidenced by the letter that Plaintiff received from Defendant Bowles in *Exhibit 1*, the City was "under no obligation to communicate with Plaintiff further."  They would not even give Plaintiff the time of day, when it was their job to do so, and for which his taxes help pay their salary.

154.    The fact that Defendant City allowed Bowles to concoct such a correspondence demonstrates a failure to properly train and educate its employees on the magnitude of applying Constitutional rights in as far as the public citizens will be affected.  This conduct shows a reckless and callous indifference to the rights of others, and had there been adequate training, Defendant

Bowles would not have been so brazen in his disrespect of Plaintiffs' rights and needs.

155.   Had Defendant City and Defendant Does 1 to 25 properly trained their employees, the constitutional violations and injuries that Plaintiff received may have been averted.  Obviously, the City had no proper training or policies implemented on the importance of meeting certain standards when in contact with the local public.  Otherwise, as Plaintiff pointed out at City Hall one day that Defendant City was violating Governor Gavin Newsom's Emergency Order for the water shutoff moratorium, they would not have said to him, "We don't care." *Id.* at ¶3, lines 12-13.

156.   By Defendant City, Bender and Strong, and Does 1 to 25 failing to properly hire, train, supervise, and retain their employees, Plaintiff has suffered damages in at least the following ways:

(i)   General damages and special damages.

(ii)   Damages pursuant to Plaintiff's Notice of Intent-Fee Schedule in an amount to be proven at trial.

(iii)   Pecuniary and non-pecuniary damages.

(iv)   Up to three times the amount of damages awarded by the Court sitting over the trial, or in a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Craig Gelber prays for damages and other judicial relief as follows:

1.   A judgment that the City wrongly disconnected Plaintiff's water utility service at 283 Sherwood Road in Willits, California, in Mendocino County;

2.   A judgment that the City violated Plaintiff Craig Gelber's civil and constitutional rights;

3.   For past, present, and future non-economic damages in an amount to be determined at trial;

4.   For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

5.   Any appropriate statutory enhanced damages;

6.   General damages according to proof, including without limitation, mental pain and anguish,

caused by the City's extreme and outrageous conduct;

7. Special damages according to proof;

8. Equitable and injunctive relief;

9. Damages pursuant to Craig Gelber's Notice of Intent-Fee Schedule (*See Exhibit T*);

10. For costs and expenses of suit;

11. For interest based on damages, as well as pre-judgment and post-judgment interest, as allowed by law, if applicable;

12. For attorney's fees pursuant to California Code of Civil Procedure, section 52 et seq. or as otherwise allowable by law;

13. For treble damages of the amount of actual damages, but in no case less than four thousand dollars ($4,000) pursuant to California *Code of Civil Procedure*, section 52 et seq. or as otherwise allowable by law;

14. Punitive and exemplary damages;

15. For declaratory and injunctive relief, including but not limited to imposition of a City policy or municipal ordinance that allows for criteria and certain exceptions available to persons pursuing an adverse possession claim so that they are allowed to obtain water utility services;

16. Any other such relief as this Court, or a jury panel, may deem appropriate.

**Craig Anthony Gelber demands a trial by jury.**

Dated: February 14, 2023

By: _Craig Anthony Gelber_
Craig Anthony Gelber
*Pro se Plaintiff*

-34-
COMPLAINT FOR DAMAGES

## EXHIBIT LIST

| | | |
|---|---|---|
| EXHIBIT A | Notice of Rejection of Claim from George Hills, dated August 16, 2022 | 2 pgs. |
| EXHIBIT B | Article by Kayo Manson-Tompkins, Posting a Red-Tag Does Not Terminate a Lease | 2 pgs. |
| EXHIBIT C | Plaintiff's offer on the property, dated March 8, 2021. | 3 pgs. |
| EXHIBIT D | Response from bank to Plaintiff's offer, dated March 17, 2021. | 1 pg. |
| EXHIBIT E | Plaintiff's Application for Water Service with Defendant City of Willits Water Department | 2 pgs. |
| EXHIBIT F | Letter from Defendant SMITH to Plaintiff which was hand-delivered to Plaintiff on or about January 18, 2021 | 1 pg. |
| EXHIBIT G | Plaintiff's response to the letter in Exhibit 5, DATED January 25, 2021 | 8 pgs. |
| EXHIBIT H | Letter from Plaintiff to Defendant CITY, delivered on or about February 10, 2021, appealing the water disconnection. | 4 pgs. |
| EXHIBIT I | Letter from Defendant Bowles to Plaintiff, dated February 18, 2021. This letter violates Plaintiff's First Amendment rights under the U.S. Constitution. | 1 pg. |
| EXHIBIT J | Letter from Plaintiff to Defendants, dated March 31, 2021, requesting an appeal. This letter was ignored by all Defendants. | 1 pg. |
| EXHIBIT K | Willits City Council Meeting Minutes from 6/9/2021 showing Plaintiff wanting to have his water back on. | 5 Pgs. |
| EXHIBIT L | PRA request, dated November 29, 2022, for a copy of the policy that says a person has to prove they own a property, or else provide permission to reside in and receive utilities at an address, in order to obtain water utilities. And if none exists, | 4 pgs. |

| EXHIBIT M | Plaintiff's correspondence addressing the incomplete response to his PRA in Exhibit 11. In response, he received another copy of the Defendant's correspondence dated November 29, 2022. | 2 pgs. |
|---|---|---|
| EXHIBIT N | Notice of Nuisance [fraudulent] sent by Defendant BOWLES re: property violations on February 9, 2021-the day *after the water meter was removed.* | 3 pgs. |
| EXHIBIT O | Plaintiff's PRA and documents returned by Defendant CITY for the purpose of knowing what existing documentation there was pertaining to follow-up of the Notice of Nuisance at 283 Sherwood Rd. Plaintiff created a cover sheet for the contents for easier reference. | 26 pgs. |
| EXHIBIT P | Reimbursement Log | 16 pgs. |
| EXHIBIT Q | Door-to-door poll of Willits residents | 3 pgs. |
| EXHIBIT R | E-mails between D. Bowles and J. Lance indicating discrimination towards Plaintiff by D. Bowles | 3 pgs. |
| EXHIBIT S | News article research on Deutsche Bank and its plethora of abandoned home across the country. | 19 pgs. |
| EXHIBIT T | Plaintiff Craig Gelber's Notice of Intent-Fee Schedule | 9 pgs. |
| EXHIBIT U | Defendants BENDER and STRONG official oaths of office. | 2 pgs. |